**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| INTERNATIONAL ASSOCIATION OF | § | Civil Action No. |
| SHEET METAL, AIR, RAIL AND | § | 3:22-CV-00083-M |
| TRANSPORTATION WORKERS – | § | |
| TRANSPORTATION DIVISION and | § | |
| BROTHERHOOD OF LOCOMOTIVE | § | |
| ENGINEERS AND TRAINMEN, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 4

    A.   The Parties ........................................................................................................ 4

    B.   Past Practice of Unilaterally Changing Attendance Standards .................................. 4

    C.   Labor Agreements Between BNSF and the Unions ...................................................... 5

    D.   The Hi Visibility (Hi Viz) Attendance Standards ........................................................ 5

    E.   The Pending Labor Dispute and Defendants' Threats of Self-Help ........................... 7

    F.   The Balance of the Harms ........................................................................................... 7

ARGUMENT ...................................................................................................................... 9

I.     PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS ........................................... 9

    A.   Applicable Legal Principles for Classification of Labor Disputes ............................ 9

    B.   The Parties' Dispute Over the Hi Viz Standards is Minor ...................................... 13

    C.   The Unions Cannot Redefine The Disagreement Over the Hi Viz
         Policy as a "Statutory" Matter or a "Major" Dispute ................................ 17

        1.   *This Is Not A Case About Interference in Union Representation* ................... 17

        2.   *The Fact That the Parties Are Bargaining Does Not Convert
            BNSF's Exercise of Existing Rights Into a Major Dispute* .............................. 19

II.    THE BALANCE OF HARMS SUPPORTS AN TEMPORARY
       RESTRAINING ORDER ........................................................................................... 20

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Air Line Pilots Ass'n Int'l v. Alaska Airlines, Inc.*,
   898 F.2d 1393 (9th Cir. 1990) ......................................................................................12

*Air Line Pilots Ass'n Int'l v. Guilford Transp.*,
   399 F.3d 89 (1st Cir. 2005) ....................................................................................12, 18

*Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*,
   869 F.2d 1518 (D.C. Cir. 1989) ..............................................................................11, 12

*Airline Pros. Ass'n of Int'l Bhd. of Teamsters v. ABX Air, Inc.*,
   274 F.3d 1023 (6th Cir. 2001) ......................................................................................12

*Airline Pros. Ass'n v. ABX Air*,
   400 F.3d 411 (6th Cir. 2005) ........................................................................................19

*Allied Pilots Ass'n v. Am. Airlines, Inc.*,
   898 F.2d 462 (5th Cir. 1990) ..............................................................................2, 11, 12

*Amtrak v. Machinists*,
   915 F.2d 43 (1st Cir. 1990) ..........................................................................................18

*Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*,
   280 F.3d 901 (9th Cir. 2001) ..............................................................................12, 17, 18

*Ass'n of Flight Attendants v. United Airlines, Inc.*,
   976 F.2d 102 (2d Cir. 1992) ..........................................................................................12

*Ass'n of Prof. Flight Attendants v. Am. Airlines*,
   843 F.2d 209 (5th Cir. 1988) ........................................................................................18

*Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R.*,
   85 F.3d 35 (2d Cir. 1996) ..............................................................................................12

*Bhd. of Locomotive Eng'rs v. Burlington N. R.R. Co.*,
   838 F.2d 1102 (9th Cir. 1988) ......................................................................................11

*Bhd. of Maint. of Way Employes Div./IBT v. BNSF Ry., Inc.*,
   834 F.3d 1071 (9th Cir. 2016) ......................................................................................17

*Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co*,
   138 F.3d 635 (7th Cir. 1997) ........................................................................................12

*Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co.*,
   19 F. App'x 731 (10th Cir. 2000) ..................................................................................12

*Bhd. of R.R. Trainmen v. Chi. River & In. R.R.*,
   353 U.S. 30 (1957) ....................................................................................................1, 9

*Bhd. of Ry. Carmen v. Atchison, Topeka & S.F. Ry.*,
   894 F.2d 1463 (5th Cir. 1990) ....................................................................................3, 17

ii

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Bhd. of Ry. Carmen v. Atchison, Topeka & Santa Fe Ry. Co.*,
   847 F.2d 403 (7th Cir. 1988) ........................................................................12, 18

*Bhd. of Ry. Carmen v. Mo. Pac. R.R.*,
   944 F.2d 1422 (8th Cir. 1991) ..............................................................................12

*Bhd. of Ry. Signalmen v. Burlington N. R.R. Co.*,
   829 F.2d 617 (7th Cir. 1987) ................................................................................12

*BLET GCA UP v. Union Pac. R.R. Co.*,
   988 F.3d 409 (7th Cir. 2021) ............................................................................1, 15

*BNSF Ry. Co. v. United Transp. Union*,
   337 F. App'x 409 (5th Cir. 2009) .........................................................................12

*Buchanan v. U.S. Postal Serv.*,
   508 F.2d 259 (5th Cir. 1975) ..................................................................................9

*Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*,
   93 F. Supp. 2d 751 (N.D. Tex. 2000) ....................................................................9

*Burlington N. & Santa Fe Ry. v. Bhd. of Maint. of Way Emps.*,
   286 F.3d 803 (5th Cir. 2002) ..................................................................................1

*Burlington N. R.R. Co. v. United Transp. Union*,
   862 F.2d 1266 (7th Cir. 1988) ..............................................................................12

*Burlington N. S. F. Ry. v. Bhd. of Maint. of Way Emps.*,
   143 F. Supp. 2d 672 (N.D. Tex. 2001) .................................................................13

*Callaway v. Skywest Airlines Inc.*,
   No. 04-179, 2006 WL 1328089 (D. Utah March 29, 2006) ..................................18

*Chi. & N.W. Transp. Co. v. Int'l Bhd. of Elec. Workers, Loc. Union No. 214*,
   829 F.2d 1424 (7th Cir. 1987) ..............................................................................12

*Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*,
   855 F.2d 1277 (7th Cir. 1988) ..............................................................................21

*Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*,
   908 F.2d 144 (7th Cir. 1990) ..................................................................................8

*Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*,
   491 U.S. 299 (1989).................................................................................... *passim*

*CSX Transp., Inc. v. United Transp. Union*,
   879 F.2d 990 (2d Cir. 1989)..................................................................................19

*Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*,
   16 F.3d 832 (7th Cir. 1994) ..................................................................................18

### TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Gen. Comm. of Adjustment, United Transp. Union, v. CSX R.R. Corp.*,
   893 F.2d 584 (3d Cir. 1990) .................................................................11

*Indep. Union of Flight Attendants v. Pan Am. World Airways*,
   789 F.2d 139 (2d Cir. 1986) .................................................................18

*Int'l Ass'n of Machinists v. Varig Brazilian Airlines*,
   855 F. Supp. 1335 (E.D.N.Y. 1994) .....................................................18

*Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. BNSF Ry. Co.*,
   No. 20 C 4220, 2021 WL 2709143 (N.D. Ill. July 1, 2021) ..................19

*Int'l Bhd. of Teamsters v. Sw. Airlines Co.*,
   875 F.2d 1129 (5th Cir. 1989) (en banc) ..............................................10

*Long Island R.R. Co. v. Int'l Ass'n of Machinists & Aerospace Workers*,
   709 F. Supp. 376 (S.D.N.Y. 1989) .......................................................13

*Louisville & Nashville R.R. Co. v. Brown*,
   252 F.2d 149 (5th Cir. 1958) ................................................................20

*Nat'l Ry. Labor Conf. v. Int'l Ass'n of Machinists & Aerospace Workers*,
   830 F.2d 741 (7th Cir. 1987) ..........................................................11, 12

*Norfolk S. Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail &
Transp. Workers – Transp. Div.*,
   518 F. Supp. 3d 1228 (N.D. Ill. 2021) .................................................15

*Ruby v. TACA Int'l Airlines, S.A.*,
   439 F.2d 1359 (5th Cir. 1971) ..............................................................10

*Ry. Labor Execs.' Ass'n v. Chesapeake W. Ry.*,
   738 F. Supp. 1544 (E.D. Va. 1990) ......................................................13

*Ry. Labor Execs.' Ass'n v. Chesapeake W. Ry.*,
   915 F.2d 116 (4th Cir. 1990) ....................................................12, 13, 19

*Ry. Labor Execs.' Ass'n v. Norfolk & W. R.R. Co.*,,
   833 F.2d 700 (7th Cir. 1987) .......................................................5, 11, 12

*Schiltz v. Burlington N. R.R.*,
   115 F.3d 1407 (8th Cir. 1997) ..............................................................11

*Sheet Metal Workers Int'l Ass'n v. Kan. City S. Ry.*,
   No. 09-CV-00091-DGK, 2009 WL 3756440 (W.D. Mo. Nov. 9, 2009) ...............13

*Sheet Metal Workers' Int'l Ass'n. v. Burlington N. R.R. Co.*,
   893 F.2d 199 (8th Cir. 1990) ..........................................................11, 12

*Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*,
   No. 21-CV-02065-M, 2021 WL 4975010 (N.D. Tex. Oct. 26, 2021) .................5, 16

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Teamsters v. Nw. Airlines*,
   21 F. Supp. 2d 751 (E.D. Mich. 1998) ..................................................................18

*Tello v. Soo Line R.R. Co.*,
   772 F.2d 458 (8th Cir. 1985) .............................................................................18

*Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*,
   281 U.S. 548 (1930) .........................................................................................9

*Union Pac. R.R. Co. v. Sheehan*,
   439 U.S. 89 (1978) ..........................................................................................11

*United Transp. Union v. Nat'l R.R. Passenger Corp.*,
   588 F.3d 805 (2d Cir. 2009) ..............................................................................18

*UTU v. S.C. Pub. Ry. Comm.*,
   130 F.3d 627 (4th Cir. 1997) .............................................................................13

*Wightman v. Springfield Terminal Ry.*,
   100 F.3d 228 (1st Cir. 1996) .............................................................................18

**STATUTES**

Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.* ..............................................................9

Railway Labor Act, 45 U.S.C. § 151 *et seq.* ................................................................1

   45 U.S.C. § 151a .............................................................................................9

   45 U.S.C. § 152 .....................................................................................3, 10, 17

   45 U.S.C. § 153 .......................................................................................1, 2, 9

**OTHER AUTHORITIES**

THE RAILWAY LABOR ACT (4th ed. 2016) ....................................................................12

**INTRODUCTION**

Defendants International Association of Sheet Metal, Air, Rail, and Transportation Workers – Transportation Division ("SMART-TD") and Brotherhood of Locomotive Engineers and Trainmen ("BLET") (collectively the "Unions") are engaged in a labor dispute with Plaintiff BNSF Railway Company ("BNSF") (the "Carrier"). The dispute arises from the Carrier's recent announcement of its High Visibility (or "Hi Viz") attendance standard, which will modify and consolidate the railroad's existing employee attendance policies and guidelines. BNSF contends that it—like other railroads—has a long-standing and well-settled implied contractual right to adopt, modify, and apply employee attendance rules and policies. *See, e.g.*, *BLET GCA UP v. Union Pac. R.R. Co.*, 988 F.3d 409, 413 (7th Cir. 2021). The Unions disagree, claiming that the Hi Viz policy violates the parties' collective bargaining agreements. Moreover, the Unions are publicly threatening to use economic self-help—which could involve strikes or slowdowns—to force BNSF to rescind the new policy. The Unions have already taken a strike authorization vote; a strike could begin as soon as BNSF implements, and slowdown could begin even before that. These actions threaten to disrupt the entire national rail transportation network.

The immediate issue before the Court is not who is right or wrong about the merits of the parties' dispute over the Hi Viz policy, but only whether that dispute is properly classified as "minor" within the meaning of the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.* Minor disputes are subject to mandatory and binding arbitration under Section 3 of the RLA, 45 U.S.C. § 153 First. It is unlawful for unions to employ or threaten strikes or other forms of self-help over minor disputes, and so it is well-settled that such strikes may and should be enjoined. *See, e.g.*, *Bhd. of R.R. Trainmen v. Chi. River & In. R.R.*, 353 U.S. 30, 34, 39, 42 & n.24 (1957) ("*Chicago River*"); *Burlington N. & Santa Fe Ry. v. Bhd. of Maint. of Way Emps.*, 286 F.3d 803, 807 (5th Cir. 2002).

A dispute is "minor"—as distinguished from "major"—whenever it implicates the "interpretation or application" of the express or implied terms of the parties' collective bargaining agreements.  45 U.S.C. § 153 First (i); *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303-04, 312 (1989) ("*Conrail*").  Thus, when a railroad asserts that a disputed action is permissible under its labor agreements, the dispute must be arbitrated unless the railroad's proffered interpretation of the agreement is not "arguable" or is "frivolous." *Conrail*, 491 U.S. at 312; *see also, e.g., Allied Pilots Ass'n v. Am. Airlines, Inc.*, 898 F.2d 462, 465 (5th Cir. 1990) (applying the *Conrail* test).

In this case, it is at least "arguable" that the parties' agreements give BNSF the right to modify its attendance policies.  As discussed in detail below and in the attached declarations, BNSF has a long and robust past practice of unilaterally adopting, modifying, and applying practices and standards governing attendance, and its authority to do so has been upheld in arbitration when challenged.  *See infra* at 13-15.  This past course of dealing reflects an implied term in the parties' agreements, giving BNSF the affirmative right to update its attendance standards. Moreover, even if BNSF lacked this extensive past practice of modifying attendance rules, it would still retain its inherent managerial discretion to do so.  As dozens of arbitration awards have held, railroads retain the power to manage employee attendance except to the extent that they have expressly and specifically surrendered the right to do so in the parties' agreements. *See infra* at 16.  It is at least arguable that, in this case, nothing in the parties' agreements restricts BNSF's implied managerial right to adopt the new attendance rules.  Accordingly, because the underlying dispute is subject to arbitration under the RLA, the Unions' threatened strike would be unlawful and should be enjoined—just as this Court previously did when the same issue arose in the past. *Burlington N. & S.F. v. BLET*, No. 4:99-cv-0675-Y (Sept. 8, 1999) (ECF No. 8) (enjoining strike over minor dispute involving attendance standards).

Because they are almost never able to show that a carrier's interpretation is "frivolous" under the *Conrail* test, the Unions often try to recharacterize this sort of dispute as a "statutory" matter, claiming that it should be viewed as, for example, a violation of Sections 2 Third and Fourth of the RLA, which prohibit interference in the employees' choice of a bargaining representative. 45 U.S.C. §§ 152 Third, 152 Fourth.  The Unions have already foreshadowed such an argument in this case, implying that the Hi Viz policy—though facially neutral—somehow discriminates against union officers.  But courts have repeatedly rejected this sort of effort to reframe a minor dispute as a statutory question, especially given that such an approach would almost always evade the *Conrail* test.  *E.g., Bhd. of Ry. Carmen v. Atchison, Topeka & S.F. Ry.*, 894 F.2d 1463, 1466-69 (5th Cir. 1990).  In this case, BNSF disagrees that there is any sort of plausible "disparate impact" on union officers—or that such an impact would give rise to a claim under Section 2 Third and Fourth—but even if the Unions could make such an argument, that would go only to the reasonableness of the terms of the Hi Viz policy, which is exactly the issue for an arbitrator to decide.  Thus, the Unions cannot justify a threatened strike by pointing to other provisions in the RLA.

Moreover, as shown in more detail below, the balance of harms and the public interest support an injunction.  Rail strikes—even if brief or localized—can cause devastating and irreparable harm to carriers, their customers, other railroads, and the general public. The threatened strike in this case would strain an already overburdened supply chain, potentially causing wide-ranging harm to the national economy.  By contrast, the Unions will suffer no harm from an injunction—they will merely be required to follow the RLA's usual dispute resolution procedures. And if the Carrier's position is ultimately proven incorrect, the employees can obtain complete relief through arbitration.  For these reasons, the Court should issue a temporary restraining order barring strikes, pending a hearing on a motion for preliminary injunction.

## STATEMENT OF FACTS

### A.     The Parties

BNSF is one of the nation's major freight railroads and operates a rail transportation system in interstate commerce in twenty-eight states, including Texas.  First Amended Complaint ("FAC") ¶¶ 2, 30.  BNSF serves thousands of industrial and commercial customers and provides a crucial link between a number of other major freight carriers, which in turn transport cargo throughout the United States and into Canada and Mexico.  FAC ¶ 30.

Defendant SMART-TD is an unincorporated association and a labor union.  FAC ¶ 2.  It represents conductors and other individuals employed by BNSF.  FAC ¶ 2.  BLET is a labor union that represents the locomotive engineers and/or conductors (operating craft employees) who are employed by BNSF.  FAC ¶ 3.

### B.     Past Practice of Unilaterally Changing Attendance Standards

BNSF has a long-standing and well-settled past practice of unilaterally changing practices, policies, and standards governing attendance for the employees at issue here: train-service employees charged with operating trains both in yards and between terminals.  *See* App. 2 at ¶ 6; App. 164 at ¶ 5.  This past practice is discussed in detail *infra*, but it includes the adoption of a formal attendance policy in 1999, that policy's replacement with the Attendance Guidelines ("ATG") the following year, and repeated amendment since then of the ATG and policies that address different attendance concerns.  When BNSF's authority to make changes to attendance policies has been challenged, the Carrier prevailed in arbitration.  Of course, BNSF's attendance policies are important to its operations.  And BNSF has repeatedly changed them, without prior bargaining, consistent with its implied right of managerial discretion.

### C.     Labor Agreements Between BNSF and the Unions

Railroad labor agreements govern rates of pay, rules, and working conditions.  Labor

agreements in the railroad industry may include both express and implied terms. *E.g.*, *RLEA v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 705 (7th Cir. 1987) ("The parties' collective bargaining agreement … includes both the specific terms set forth in the written agreement and any well-established practices that constitute a 'course of dealing' between the carrier and employees."). Moreover, there are typically multiple overlapping written agreements that apply at any given time, with the newer agreement terms supplanting any older inconsistent terms. Where there is no express or implied term restricting a railroad's discretion, the railroad retains an inherent managerial prerogative to make reasonable changes as necessary to carry out its business. App. 3 at ¶ 9. BNSF thus possesses managerial rights similar to those possessed by the carrier in *Southwest Airlines Pilots Ass'n v. Southwest Airlines Co.*, No. 21-CV-02065-M, 2021 WL 4975010 (N.D. Tex. Oct. 26, 2021), where this Court recently found that a union could not require management to cease implementation of a COVID-19 vaccine mandate. *Id.* at *9-10.

### D.    The Hi Visibility (Hi Viz) Attendance Standards

On January 10, 2022, BNSF announced new attendance standards—the Hi Viz program—to replace the ATG, effective February 1, 2022. App. 165 at ¶ 8. The Hi Viz policy "is intended to replace the patchwork of unilaterally imposed policies … with one comprehensive attendance program." *Id.* ¶ 8. Over the years, numerous employees expressed that, under the ATG, it was sometimes difficult to know when exactly they might exceed the ATG "threshold" (the amount of time an employee can be off without being in violation) and thus possibly be subject to progressive discipline. *Id.* ¶ 9. They also complained that it was impossible to judge future months' work activity that could reduce their current threshold, which could also lead to discipline. *Id.*

As a result, BNSF developed Hi Viz. *Id.* ¶ 10. This attendance program assigns varying "points" to different types of absences (weekday, weekend, holiday, a missed call, etc.) and triggers progressive discipline if an employee's points go to zero. *Id.* The program is "Hi Viz"

because it has a dashboard where employees can easily check their current point total and see how particular events subtracted or added to that total.  *Id*.  In addition, Hi Viz uses a points system to address all of the different types of attendance policies it has previously adopted under one program.  *Id.*

Under Hi Viz, employees start with 30 points and are subject to point deductions based on types of service and the day the event began.  *Id.* ¶ 11. Unavailable time is measured in 24-hour increments.  *Id*.  Each time an employee exhausts his or her points, the employee is subject to discipline and the point total is reset to 15.  *Id*.  The progression of discipline is the same as under the previous attendance policy:  employees are subject to a 10-day suspension, 20-day suspension, and then dismissal.  *Id*.  If an employee remains discipline free for 24 months, then the discipline progression is reset.  *Id*.  Following such a reset, the discipline issued for an infraction would accordingly be the first step: a 10-day suspension.  *Id.*

Hi Viz seeks to address employee attendance concerns while ensuring that BNSF has enough staffing to operate trains on schedule.  BNSF has found that, historically, the elongation of weekends and holidays has had a negative impact on service.  So Hi Viz expands and refines a fundamental concept embedded in the ATG: "assigning different values to absences based on historical levels of availability."  *Id.* ¶ 12.  Under Hi Viz, an employee is awarded a Good Attendance Credit—adding four points to the employee's total—for any 14-day period the employee is available for work (with limited exceptions).  *Id.* ¶ 13.  The Good Attendance Credit was not available under the ATG or other previous policies, and so at least arguably reflects a more generous approach to attendance.  *Id.*

### E.      The Pending Labor Dispute and Defendants' Threats of Self-Help

In response to BNSF's announcement of the High Viz attendance program, the Unions have taken the position that the railroad is engaged in a unilateral change of agreements in violation

of Section 2 Seventh of the RLA, which they refer to as a "major dispute." *Id.* ¶ 14.

On January 11, 2022, SMART TD's BNSF General Chairmen formally asked their President, Jeremy Ferguson, to authorize strike authority over the February 1 implementation of Hi Viz. *Id.* ¶ 23. The following day, BLET President Dennis Pierce directed his BNSF General Chairmen to poll their memberships to "withdraw service" (that is, strike) over the February 1 implementation of the Hi Viz attendance policy. *Id.* ¶ 24. Once a strike is authorized, the Unions' practice in these circumstances has been to initiate a strike without warning. *Id.* ¶ 25.

The Unions have refused to provide assurances to BNSF that they will withhold use of economic force until this matter is resolved in arbitration. A strike could occur at any time prior to or after implementation of the new attendance program on February 1, 2022. *Id.* ¶ 26. We also have reason to believe that the Unions and/or the employees they represent are planning a sick out—a de facto strike in which employees call-in sick en masse—on or before February 1, 2022. *Id.* Indeed, having already promoted self-help on this issue, the Unions may have set the process for strikes in motion whether or not the Unions want to formally proceed.

### F.     The Balance of the Harms

BNSF serves thousands of industrial and commercial customers, many of whom have no other access to rail transportation, and provides a crucial link between a number of the country's other major freight carriers. *Id.* ¶ 28. Any disruption of BNSF's operations would therefore have a serious impact on interstate and international commerce, exacerbating the supply-chain problems the nation is already suffering. *Id.* ¶ 34.

Any use of self-help by the Unions could shut down BNSF's operations, deprive shippers of transportation, deprive BNSF of the use of its tracks, facilities, and revenues, and put other BNSF employees out of work for the duration of the strike. *Id.* ¶ 30. In addition, any strikes by the Unions will cause immediate, substantial, and lasting disruptions to BNSF's schedules,

7

resulting in delays long after any strike is ended. *Id.* ¶ 27.  That could cause a substantial loss of business for BNSF, both during the duration of the work stoppage and during the period of lingering delays after it ends. *Id.* ¶ 30-31.  Moreover, delays and disruptions resulting from a strike can cause BNSF to suffer a loss of customer goodwill and future business. *Id.* ¶ 31.   These harms are inherently irreparable.  As Judge Posner has explained, carriers are "peculiarly vulnerable" to strikes because of their inability to recover from interruptions to operations:

> Unlike manufacturing industries and even some service industries, the transportation industry does not produce a storable commodity, and so it cannot produce for inventory in anticipation of a strike or accelerate production afterward to make up for lost production during the strike.

*Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990).

In addition, because BNSF interchanges traffic with other major railroads, a work stoppage by the Unions would quickly disrupt the operations of other railroads as well.  Macedonio Decl. ¶ 32.  These disruptions could impact rail traffic all across the country.  *Id.*  Because of the scope of BNSF's operations, even a partial or temporary shutdown would have a drastic impact on the public and large segments of the national economy.  *Id.* ¶ 33, 38.  Deliveries of critical fuel supplies for power plants could be interrupted, urban water treatment plants could be idled for lack of chemicals, and manufacturers could be forced to suspend operations.  *Id.* ¶ 33.  Thus, any strike or other self-help has the potential to interfere with nationwide rail transportation in interstate and international commerce. *Id.* ¶ 37.

## ARGUMENT

Under the law of this Circuit, preliminary injunctive relief is appropriate if (1) there is a substantial likelihood that the plaintiff will prevail on the merits, (2) there is a substantial threat of irreparable injury, (3) the balance of harms weighs in favor of an injunction, and (4) the public interest supports an injunction. *E.g.*, *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 266 (5th Cir. 1975). All of these factors weigh in favor of temporary injunctive relief in this case.[1]

## I.   PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS

### A.   Applicable Legal Principles for Classification of Labor Disputes.

The "major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes'" in order to "safeguard the vital interests of the country" in uninterrupted rail service. *Texas & N.O.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 565 (1930); *see also* 45 U.S.C. § 151a(1). Where the RLA has channeled particular types of labor-management disputes into procedures for resolution, strikes are unlawful and should be enjoined, notwithstanding the limitations imposed by the Norris-LaGuardia Act ("NLGA"), 29 U.S.C. § 101 *et seq.* *See Chicago River*, 353 U.S. at 40-42 (holding that NLGA must be accommodated to the RLA to allow injunctions against strikes).

Section 3 of the RLA channels all disputes over the "interpretation or application" of labor agreements to final and binding arbitration. 45 U.S.C. § 153 First (i). Arbitral boards have exclusive jurisdiction to resolve the merits of these so-called "minor disputes." *Conrail*, 491 U.S. at 304. Thus, strikes over minor disputes violate Section 3 of the RLA and may be enjoined. *Chicago River*, 353 U.S. at 39, 42 & n.24; *see also, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Emps.*, 93 F. Supp. 2d 751, 758 (N.D. Tex. 2000).

---

[1]        Because the threatened strike would violate the RLA, Plaintiff is not required to show irreparable harm, *Conrail*, 491 U.S. at 303, but nevertheless has made that showing, *see infra* at 20-21.

Faced with this limit on the right to strike, rail unions—like SMART-TD and BLET in this case—will usually claim that their interpretation of the agreement is so plainly right, and the carrier's so wrong, that the carrier's proffered interpretation is just a sham designed to cover up an attempted "unilateral change" in the collective bargaining agreement, which would be unlawful under § 2 Seventh of the RLA.  *See* 45 U.S.C. § 152 Seventh.  In such circumstances, the union will often argue that the case presents a "major dispute," not a minor dispute.  Thus, the union claims, it has the right to strike rather than arbitrate.

However, in its landmark *Conrail* decision, the Supreme Court held that when a railroad and a union differ over the taxonomy of a labor dispute, the dispute must be classified as a "minor dispute" unless the railroad's proffered interpretation is not "arguably justified" such that it is "frivolous" or "obviously insubstantial."  491 U.S. at 306.  The Court explained as follows:

> Verbal formulations of [the legal test for identifying minor disputes] have differed over time and among the Circuits: phrases such as "'not arguably justified,' 'obviously insubstantial,' 'spurious,' and 'frivolous' have been employed."  These locutions are essentially the same in their result.  They illustrate the relatively light burden which the railroad must bear in establishing exclusive arbitral jurisdiction under the RLA.  'To the extent that abstract words can deal with concrete cases, we think that the concept embodied in the language adopted by these . . . Courts of Appeals is correct.'  Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement.  Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.

*Id.* at 306-07 (citations omitted); *see also id.* at 305 (noting that the "distinguishing feature" of a minor dispute is that it "may be conclusively resolved by interpreting the existing agreement"); *Int'l Bhd. of Teamsters v. Sw. Airlines Co.*, 875 F.2d 1129, 1133-34 (5th Cir. 1989) (en banc) (dispute is minor if carrier's interpretation is "arguable"); *Ruby v. TACA Int'l Airlines, S.A.*, 439 F.2d 1359, 1363 n.5 (5th Cir. 1971) (holding that dispute is major only if carrier's interpretation is "wholly spurious").

In applying the *Conrail* test, a court should be mindful that "[i]t is the role of the arbitrator, not the court, to choose between the parties' interpretations of the Agreement." *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518, 1524 (D.C. Cir. 1989). Moreover, while the railroad has a "relatively light" burden to show that a dispute is minor, as a practical matter, there is a strong presumption in favor of finding that disagreements are minor disputes. *See, e.g.*, *Allied Pilots Ass'n*, 898 F.2d at 465 (courts err in favor of finding disputes to be minor); *Schiltz v. Burlington N. R.R.*, 115 F.3d 1407, 1414 (8th Cir. 1997) ("[T]here is a presumption that disputes between railroads and their unionized employees are minor, and thus, arbitrable.") (citing *Conrail*, 491 U.S. at 307). Indeed, "if there is any doubt as to whether a dispute is major or minor, a court will construe the dispute to be minor." *Ry. Labor Execs.' Ass'n v. Norfolk & W. R.R. Co.*, 833 F.2d 700, 705 (7th Cir. 1987); *Bhd. of Locomotive Eng'rs v. Burlington N. R.R. Co.*, 838 F.2d 1102, 1111 (9th Cir. 1988) ("When in doubt, courts construe disputes as minor.").[2]

This means that a carrier's interpretation should not be deemed frivolous if it is "questionable" or "improbable," or even if the court believes that it is affirmatively wrong. *See Nat'l Ry. Labor Conf. v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 749 (7th Cir. 1987); *Sheet Metal Workers' Int'l Ass'n. v. Burlington N. R.R. Co.*, 893 F.2d 199, 205 (8th Cir. 1990). In fact, virtually every court of appeals to face the "major/minor" question in the last

---

[2]     There are at least two independent policy considerations that support this presumption. First, "[r]eferring arbitrable matters to the Board will help to 'maintain agreements,' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in the 'common law of [the] particular industry.'" *Conrail*, 491 U.S. at 310; *see also Air Line Pilots Ass'n Int'l*, 869 F.2d at 1522 ("Construing the 'common law of a particular industry' is a question of contract interpretation within the expertise and authority of an arbitrator, not the court."). Second, if the employees' position is sustained, the arbitrator can make them whole. *Gen. Comm. of Adjustment, United Transp. Union, v. CSX R.R. Corp.*, 893 F.2d 584, 593 (3d Cir. 1990) ("In minor disputes, the Board has full authority to resolve the matter and can grant a complete and adequate remedy to the prevailing party."). Thus, employees' rights are protected when matters are resolved through arbitration, without burdening the courts with the many thousands of railroad labor disputes that arise every year. *See Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978) (one of the purposes of the RLA is "keep[ing] these so-called 'minor' disputes within the Adjustment Board and out of the courts").

35 years has concluded that any good-faith interpretation of an agreement cannot be dismissed as "frivolous."[3]  The few cases that did find a carrier's interpretation to be "frivolous" all involved situations where the circumstances—above and beyond just a poor contractual argument—made it evident that the carrier was repudiating the agreement.[4]

Under the *Conrail* standard, a court should assess the sufficiency of the carrier's interpretation in light of any source or justification that an arbitrator might employ in deciding the merits of the dispute.  This includes a variety of factors beyond the text of the agreement itself, including the "parties' 'practice, usage and custom,'" bargaining history, analogous agreements, arbitration awards, and the like.  *Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co*, 138 F.3d 635, 641 (7th Cir. 1997); *see also* THE RAILWAY LABOR ACT at 7-11, n.26 (4th ed. 2016) (collecting cases).  In particular, a court may find that a dispute is minor based solely on "implied contractual terms, as interpreted through established past practice."  *Gen. Comm. of Adjustment.*, 893 F.2d at 592.

---

[3]    *See, e.g.*, *BNSF Ry. Co. v. United Transp. Union*, 337 F. App'x 409, 411-12 (5th Cir. 2009); *Air Line Pilots Ass'n Int'l v. Guilford Transp.*, 399 F.3d 89 (1st Cir. 2005);  *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 280 F.3d 901, 905-07 (9th Cir. 2001); *Airline Pros. Ass'n of Int'l Bhd. of Teamsters v. ABX Air, Inc.*, 274 F.3d 1023, 1029 (6th Cir. 2001);  *Bhd. of Maint. of Way Emps. v. Union Pac. R.R. Co.*, 19 F. App'x 731, at *3-4 (10th Cir. 2000); *Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R.,* 85 F.3d 35, 38-39 (2d Cir. 1996); *Ass'n of Flight Attendants v. United Airlines, Inc.*, 976 F.2d 102, 105 (2d Cir. 1992); *Bhd. of Ry. Carmen v. Mo. Pac. R.R.*, 944 F.2d 1422, 1429 (8th Cir. 1991); *Ry. Labor Execs.' Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116 (4th Cir. 1990); *Air Line Pilots Ass'n Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1296-97 (9th Cir. 1990); *Am. Airlines, Inc.*, 898 F.2d at 464-65; *Sheet Metal Workers Int'l Ass'n v. Burlington N. R.R. Co.*, 893 F.2d 199, 204-05 (8th Cir. 1990); *Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518, 1524-25 (D.C. Cir. 1989); *Chi. & N.W. Transp. Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 214*, 829 F.2d 1424, 1429-30 (7th Cir. 1987); *Bhd. of Ry. Signalmen v. Burlington N. R.R. Co.*, 829 F.2d 617, 620-21 (7th Cir. 1987); *Ry. Labor Execs.' Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 706-08 (7th Cir. 1987); *Bhd. of Ry. Carmen v. Atchison, Topeka & Santa Fe Ry. Co.*, 847 F.2d 403, 410-12 (7th Cir. 1988); *Nat'l Ry. Labor Conf.*, 830 F.2d at 748-51.

[4]    *See, e.g.*, *Burlington N. R.R. Co. v. United Transp. Union*, 862 F.2d 1266, 1274 (7th Cir. 1988) (railroad's interpretation reflected changes to agreement that it was unable to obtain in negotiation with union).

In making this determination, a court need not, and indeed should not, resolve factual questions arising from the dispute.  Rather, factual issues—including any fact questions about the parties' past practices—must be left to the arbitrator.  *See, e.g.*, *Long Island R.R. Co. v. Int'l Ass'n of Machinists & Aerospace Workers*, 709 F. Supp. 376, 387-88 (S.D.N.Y. 1989) ("factual dispute" over the content of the parties' "working relationship" was an issue to be decided in arbitration); *Sheet Metal Workers Int'l Ass'n  v. Kan. City S. Ry.*, No. 09-CV-00091-DGK, 2009 WL 3756440, at *4 (W.D. Mo. Nov. 9, 2009).

Finally, it should be noted that a railroad may continue to apply its interpretation of the agreement or make a disputed change during the pendency of the minor dispute resolution processes.  *Conrail*, 491 U.S. at 310 (no "obligation on the part of an employer to maintain the status quo pending" resolution of a minor dispute).[5]

### B.      The Parties' Dispute Over the Hi Viz Standards is Minor.

In this case, the BNSF at least "arguably" has an existing right to adopt the Hi Viz policy.  Two separate considerations support that conclusion.

1.      BNSF's adoption of the Hi Viz policy is arguably justified by the railroad's implied right to manage employee attendance, as evidenced by past practice.  As this Court noted in 1999, "BNSF and its predecessors have a history of implementing policies regarding availability for work, attendance, and absenteeism . . . for at least twenty years."  *Burlington N.& S.F. v. BLET*, No. 4:99-cv-675-Y (ECF No. 8).  Even at that time, this history was sufficient to "arguabl[y]" establish the railroad's right to adopt a new attendance policy.  *Id.* ¶ 6.

---

[5]      *Burlington N. S. F. Ry. v. Bhd. of Maint. of Way Emps.*, 143 F. Supp. 2d 672, 678 (N.D. Tex. 2001) (noting that "subject of minor dispute can be implemented pending arbitration"); *see also UTU v. S.C. Pub. Ry. Comm.*, 130 F.3d 627, 636 (4th Cir. 1997) (same);  *Ry. Labor Execs.' Ass'n v. Chesapeake W. Ry.*, 738 F. Supp. 1544, 1555 (E.D. Va.) (same), *aff'd in part*, 915 F.2d 116 (4th Cir. 1990).

In the 23 years since that case was decided, BNSF's practice of unilaterally establishing, modifying, and applying attendance standards (and related rules governing availability or absenteeism) has only grown more robust.   Some examples include:

- After Judge Buchmeyer ruled in BNSF's favor, finding that the adoption of its 1999 attendance policy was a minor dispute subject to arbitration, BNSF subsequently prevailed in the arbitration itself.  The arbitrator ruled that the policy was within BNSF's managerial prerogative.  App. 3 at ¶ 9-10.

- BNSF modified its attendance policy in 2000, replacing it with the Attendance Guidelines ("ATG").  *Id.* ¶ 11 & Ex. 1-C (App. 73).

- BNSF modified the ATG and instituted additional standards in 2006, including new rules for "assigned service" and "mixed service."  *Id.* ¶ 11 & Ex. 1-D (App. 74).

- In 2010, BNSF implemented its "low-performance" standard as a separate policy in addition to the ATG. App. 4 at ¶ 13 & Ex. 1-E (App. 75).  Union challenges to the adoption of the low-performance standard were rejected by arbitrators, who deemed adoption of the standard to be within the ambit of BNSF's managerial rights.  *Id.* ¶ 14 & Exs. 1-G & 1-H (App. 86-93).

- BNSF further amended the ATG in 2011, removing attendance discipline handling from the "Policy for Employee Performance Accountability" and reducing the progressive step discipline from 5 to 4 before an employee could be dismissed for failure to perform full time service (among other changes).  App. 5 at ¶ 15 & Ex. 1-I (App. 94).

- In 2012, BNSF modified the ATG yet again.  It made a wide range of changes to attendance rules for employees who are bumped, changed how weekend layoffs are calculated, redefined layoff periods, and made changes concerning how the process of clocking out at the end of a work day would interact with the railroad's attendance policies.  *Id.* ¶ 16 & Ex. 1-J (App. 97).

- BNSF again exercised its right to change the ATG in 2015.  These changes mostly concerned the time an employee spent "waiting turn," which is a period when a pool-service employee is marked off, and is not marked up until the train they missed is back at the employee's home terminal.  That time was recategorized as unavailable time and subject to the ATG.  *Id.* ¶ 17 & Ex. 1-K (App. 100).

- BNSF added a new attendance standard for "high-impact" days (*i.e.* holidays) in 2019.  *Id.* ¶ 18.   This was a substantial addition to the existing policies, providing that even employees who are otherwise in compliance with ATG could be subject to discipline if they were too often absent on high impact days.  App. 6 at ¶ 18 & Ex. 1-L (App. 102).

- Finally, just last year, BNSF removed one of the progressive discipline steps from the ATG.  *Id.* ¶ 19 & Ex. 1-M (App 103).

These examples reflect an extremely well-settled practice of modifying attendance standards without bargaining, and therefore at least "arguably" establish BNSF's implied contractual right to do so.   Indeed, BNSF's past practice evidence is arguably even more extensive than that of other railroads who have relied on similar evidence to show that disputes over attendance policies are "minor."   Union Pacific, for example, recently amended its attendance standard to adopt a points-based system similar to BNSF's Hi Viz policy.  When BLET challenged that action, the railroad pointed to seven other instances where it had unilaterally made changes. *See BLET GCA UP*, 988 F.3d at 411.   The district court held that was sufficient to arguably show that the railroad had a right to modify its policy, and the Seventh Circuit affirmed.   It reasoned as follows:

> It is undisputed that Union Pacific has unilaterally imposed changes in attendance policy for at least the past 22 years. In 1998 the company launched a system-wide attendance policy for locomotive engineers known as the Union Pacific TE&Y Attendance Policy. This change was not bargained for with the Brotherhood. Union Pacific unilaterally modified that policy in 1999. It did so again in 2004, 2006, 2011, 2015, 2017, and 2018—all without going to the bargaining table.  The point of this tally is not to cement the number of times a railroad must act to establish a course of dealing. But this history does show a pattern, and that pattern, in turn, establishes beyond dispute that Union Pacific stood on solid ground in considering the Brotherhood's challenge to the attendance policy modifications to reflect a minor dispute—a challenge to the company's exercise of authority implied and established as part of existing collective bargaining agreements through the parties' course of dealing. The district court saw this as plain as day, dismissed the Brotherhood's claim, and directed the union to resolve its difference with Union Pacific through arbitration. We agree on all points.

*Id.* at 414.  In fact, the Seventh Circuit found that this was so clear that the court imposed sanctions on BLET for filing a frivolous appeal.  *Id.* at 415.  Other recent decisions reach similar conclusions. *Norfolk S. Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, 518 F. Supp. 3d 1228, 1232-33 (N.D. Ill. 2021) (dispute over a carrier's "change in its attendance policy" is minor because it arguably fell "within the scope of the authority the parties' previously

granted the Carrier with respect to its attendance policy").

2.      Even if BNSF did not have extensive past practice evidence to support a long-standing implied contractual right to modify and manage attendance, it would still retain the right to do so as a function of its reserved managerial rights.  As shown in the attached arbitration awards, "[r]ailroads like BNSF retain an implied management right to implement reasonable rules and policies as long as such rules and policies are not inconsistent with the express terms of applicable collective bargaining agreements."  App. 6 at ¶ 21 & Exs. N-P (App. 106-56).  That is especially so when it comes to employee attendance.  As the Kasher Award indicates, there are a "significant number" of awards that "have addressed the employer's right to manage employees' attendance through the promulgation and implementation of a reasonable attendance/availability policy."  App. 58.  Arbitrator Kasher relied on that authority in upholding BNSF's right to implement a previous attendance standard, and so it is certainly at least "arguable" that an arbitrator could and would do so here.  The Unions have not and cannot point to any express contract language suggesting that BNSF has surrendered its right to manage attendance.

This Court has recently found that other labor disputes arising from a company's decision to alter its employment policies can be "arguably" justified by the carrier's reliance on reserved managerial discretion.  In *Southwest Airlines Pilots Ass'n v. Southwest Airlines Co.*, No. 21-CV-02065-M, 2021 WL 4975010, *9-10 (N.D. Tex. Oct. 26, 2021), the airline was relying on an express management rights clause to justify the unilateral implementation of policies relating to COVID-19.  In this case, BNSF is relying on its implied managerial rights, as revealed by the extensive arbitral authority referenced above.  But the analysis is the same—in both circumstances, it is not "frivolous" for the employer to contend that it retains discretion to set and modify policies except where specifically prohibited from doing so.

**C.      The Unions Cannot Redefine The Disagreement Over the Hi Viz Policy as a "Statutory" Matter or a "Major" Dispute.**

The Unions have almost never succeeded in showing that a railroad's position is frivolous. And they have never, to BNSF's knowledge, been able to do so in a case like this, where the railroad can point to past practice justifying its position.  Accordingly, rather than try to meet the *Conrail* test, the Unions have, in recent years, taken to trying to reframe the argument, suggesting that some different analysis should apply.  They typically proffer two different arguments, neither of which is viable here.

*1.     This Is Not A Case About Interference in Union Representation*

The Unions sometimes contend that the dispute should be viewed as a question of interference with employee rights under Section 2 Third or Section 2 Fourth of the RLA.  45 U.S.C. §§ 152 Third, 152 Fourth.  More specifically, they may argue that the railroad's actions degrade (in some indirect fashion) the Unions' ability to represent their members.  In this case, for example, the Unions have suggested that the Hi Viz policy could somehow interfere with local union officers' ability to represent their members.  App. 167 at ¶ 15.  For several reasons, that is not a viable argument.

*First*, courts should be wary of any "attempt[] to sidestep the *Conrail* framework."  *Bhd. of Maint. of Way Employes Div./IBT v. BNSF Ry., Inc.*, 834 F.3d 1071, 1077 (9th Cir. 2016); *see also AFA v. Horizon Air Indus., Inc.,* 280 F.3d 901, 904 (9th Cir. 2001) (minor dispute cannot be reframed as union interference claim under Section 2 Third and Fourth).  The *Conrail* analysis applies even where a union alleges "a direct statutory violation" of the RLA, such as a claim under Section 2 Third or Fourth.  *BRC*, 894 F.2d at 1467.  In other words, the Unions may not "shake off the burdens of *Conrail*" merely by invoking a related statutory argument.  *Bhd. of Maint. of Way Employes Div./IBT*, 834 F.3d at 1077.

17

*Second*, there is no plausible claim in this case under Section 2 Third and Fourth.  In the post-certification context—*i.e.*, where, as here, there is already a union in place—the applicability of Sections 2 Third and Fourth is limited to two kinds of "exceptional circumstances." *BRAC v. Atchison, T. & S.F. Ry.*, 847 F.2d 403, 408 (7th Cir. 1988).  The first is where "the extrajudicial dispute-resolution framework of the RLA is either unavailable or ineffective." *Id.* at 411.[6]  "In those disputes in which the RLA's extrajudicial dispute-resolution mechanisms are capable of adequately protecting the rights of the parties, federal courts may not interfere with the statutory process." *Id.* at 409.  That is especially so where "the employer argues that its actions are allowed by a collective bargaining agreement." *Id.*  The other situation is where the employer's actions 'strike a fundamental blow to union or employer activity and the collective bargaining process itself.'" *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 841 (7th Cir. 1994).  In other words, it must be a case where the employer is seeking to destroy the union through acts of discrimination, coercion, or intimidation.  *Indep. Union of Flight Attendants v. Pan Am. World Airways*, 789 F.2d 139, 141 (2d Cir. 1986).[7]  Neither such "exceptional" circumstance is remotely presented here:  claims about the reasonableness of the Hi Viz policy (including vis-à-vis union officers) are certainly resolvable in arbitration, and nothing about the policy conceivably seeks to "destroy" the Unions.

---

[6]      *See also, e.g., Horizon Air*, 280 F.3d at 905-07; *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 813 (2d Cir. 2009); *Air Line Pilots Ass'n v. Guilford Transp. Indus.*, 399 F.3d 89, 103 (1st Cir. 2005).

[7]      *See also, e.g., UTU v. Amtrak*, 588 F.3d 805 (2d Cir. 2009); *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996); *Amtrak v. Machinists*, 915 F.2d 43 (1st Cir. 1990); *Ass'n of Prof. Flight Attendants v. Am. Airlines*, 843 F.2d 209, 210-12 (5th Cir. 1988); *Tello v. Soo Line R.R. Co.*, 772 F.2d 458, 462 (8th Cir. 1985); *Callaway v. Skywest Airlines Inc.*, No. 04-179, 2006 WL 1328089 (D. Utah March 29, 2006); *Teamsters v. Nw. Airlines*, 21 F. Supp. 2d 751, 756 (E.D. Mich. 1998); *Int'l Ass'n of Machinists v. Varig Brazilian Airlines*, 855 F. Supp. 1335, 1357-58 (E.D.N.Y. 1994).  A showing of "substantial" animus is required.  *Teamsters*, 21 F. Supp. 2d at756.  Thus, for example, disciplinary investigations of union officers—even if supported by flimsy grounds—do not "approach the kind of extraordinary anti-union animus" required to support a claim under Sections 2 Third and Fourth.  *Amtrak*, 915 F.2d at 52-53.

*Third*, as a factual matter, nothing in the new BNSF attendance policy disadvantages union officers.  As explained by Mr. Macedonio in his declaration, time spent on union business is *not* penalized under the Hi Viz policy.  App. 167 at ¶ 15.  And while an employee must have a period of full availability in order to earn a "Good Attendance Credit," the new policy is, in all practical respects, no more onerous that the prior rules when it comes to local union officers.  *Id.*  Indeed, under the old policy, local officers who ran afoul of the attendance guidelines had to have a year of good attendance in order to reset, and so the new policy is at least arguably more generous in this respect.  *Id.*

2.    *The Fact That the Parties Are Bargaining Does Not Convert BNSF's Exercise of Existing Rights Into a Major Dispute.*

SMART-TD has repeatedly argued in recent cases that a dispute should be viewed as "major" instead of "minor" because some aspect of the dispute relates to a subject being discussed by the parties in collective bargaining.  It has never prevailed on that theory.  That is because the pendency of demands for *changes* in agreements—or the fact that the parties are in the midst of discussing such changes—has no bearing on whether a railroad has the right to take action under its *existing* agreements.  *See, e.g.*, *Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. BNSF Ry. Co.*, No. 20 C 4220, 2021 WL 2709143, at *7-8 (N.D. Ill. July 1, 2021) (rejecting argument by SMART-TD that the submission of a particular issue to bargaining necessarily means that the dispute is no longer minor) (collecting cases). [8]

---

[8]   *See also Chesapeake W. Ry.*, 915 F.2d at 120 ("The Achilles' heel of the Unions' argument is that the railroad's actions are 'arguably justified' by existing agreement. The service of a section 6 notice and the beginning of bargaining over the proposed change does not convert a minor dispute into a major one."); *CSX*, 893 F.2d at 594 ("Because a minor dispute is involved, § 6's bargaining and status quo requirements are inapplicable and the arguments made by the Union on the nature of these requirements are not pertinent."); *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 999 (2d Cir. 1989) ("Once the district court ruled that the controversy was a minor dispute, the *status quo* issue upon which appellants rely was mooted."); s*ee also Airline Pros. Ass'n v. ABX Air*, 400 F.3d 411, 415 (6th Cir. 2005) (rejecting the notion that "every dispute arising under a CBA that is being renegotiated is a major dispute").

The same is true here.  Even if BNSF (and other railroads) are bargaining with BLET and SMART-TD over what *future* attendance rules might be, it remains the case that BNSF (at least arguably) has the right under *current* agreements to implement new attendance standards or policies.  Thus, the pendency of bargaining does not alter the conclusion that the parties are engaged in a minor dispute over the Hi Viz policy.

## II. THE BALANCE OF HARMS SUPPORTS A TEMPORARY RESTRAINING ORDER

The balance of harms and the public interest clearly favor issuance of a temporary restraining order here as both weigh entirely on the side of the Carrier.  As outlined above, a strike against a railroad results in a shutdown of its operations, deprives it of the use of its track and facilities and of the income it would earn from such operations, as well as depriving employees of their work.  And as outlined in detail in the Macedonio Declaration, a strike or other self-help by the Unions over the implementation of Hi Viz threatens to inflict massive, immediate, and irreparable harm on BNSF.  App. 170-72 at ¶¶ 27-33.   The Carrier could easily lose millions of dollars of revenue, with no effective way to recover those losses from the Unions. *See Louisville & Nashville R.R. Co. v. Brown*, 252 F.2d 149 (5th Cir. 1958) (no cause of action exists under the RLA for damages caused by an illegal strike).

Perhaps more importantly, the harm from a strike would be felt far beyond the BNSF system.  BNSF interchanges with the other major freight railroads in the United States.  App. 171-72 at ¶ 32.  A strike on BNSF would therefore soon affect operation of the other major carriers.  Members of the public who rely on rail transportation would also be affected.  For example, "[c]ongestion and delays on BNSF's lines directly affect … commuter rail traffic in and around Chicago.  Such delays also impact Amtrak." *Id.*  Manufacturers, too, would be harmed by a strike. "Many manufacturers served by BNSF rely on 'just-in-time' delivery of parts and supplies, and so

would be forced to idle their plants if service is disrupted." *Id.* ¶ 33.  A disruption in BNSF's services could also cause "power plants across the country [to] quickly run low on coal, risking disruption of electrical service to millions of people." *Id.*  City water suppliers that depend on timely delivery by rail of chemicals for water treatment would also be at risk.  *Id.*

Moreover, BNSF serves as a key link between a number of major U.S. and international markets.  Even a brief shutdown would interfere with the shipment of a wide range of commodities; the impact of this disruption would be felt throughout the economy.  In short, a strike by the Unions would irreparably injure both the Carriers and their non-striking employees, as well as the public generally, by interfering with the interstate commerce of passengers, mail, military personnel and material, food, fuel, and other freight and personnel essential to the public health and safety.  *Id.* ¶ 37.

There is nothing to weigh on the other side of the equitable scale.  Employees will suffer no harm whatsoever if they are enjoined from unlawful strikes over this dispute.  In no way does this motion decide the merits of the Unions' claims.  As noted above, if the Unions' position is correct, the employees will have an adequate remedy in arbitration, including make whole relief. *See Conrail*, 491 U.S. at 310 n.8; *see also Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 855 F.2d 1277, 1288 (7th Cir. 1988) (remedies under arbitration are not inadequate because the Board would be "able to order the necessary payment of monies and adjustments in seniority levels it deems necessary to make those employees whole.").

In sum, the Carrier and the public interest will suffer irreparable harm from a strike by the Unions, whereas the Defendants will suffer no harm at all if such a strike is enjoined.  Thus, this Court should temporarily restrain the Unions from striking over the dispute about the implementation of the Hi Viz standards.

21

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's motion and enter an order temporarily restraining Defendants from engaging in strikes or other forms of self-help until a ruling can be issued on a preliminary injunction.

Dated:  January 18, 2022                    Respectfully submitted,

                                                */s/ Russell D. Cawyer*

David M. Pryor
Texas Bar No. 00791470
BNSF RAILWAY COMPANY
2500 Lou Menk Drive, AOB-3
Fort Worth, Texas 76131-2828
Tel.: (817) 352-2286
Fax: (817) 352-2399
David.Pryor@BNSF.com

Donald J. Munro
D.C. Bar No. 453600
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: dmunro@jonesday.com

Russell D. Cawyer
State Bar No. 00793482
Taylor J. Winn
State Bar No. 24115960
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Facsimile: (817) 335-2820
russell.cawyer@kellyhart.com
taylor.winn@kellyhart.com

ATTORNEYS FOR PLAINTIFF
BNSF RAILWAY COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Memorandum was served upon counsel for Defendants

(listed below) by electronic means on January 18, 2022.

Kevin C. Brodar
Smart Transportation Division
24950 Country Club Blvd., Suite 340
North Olmsted, Ohio 44070
(216) 228-9400
kbrodar@smart-union.org

James Petroff
Wentz, McInerney, Piefer & Petroff
3311 Bear Pointe Cir.
Powell, Ohio 43065
(614) 756-5566
jpetroff@lawforlabor.com

*/s/ Russell D. Cawyer*
Russell D. Cawyer
